**Farouk ABDEL–MUHTI, Petitioner**

v.

**John D. ASHCROFT, et. al, Respondents**

**No. Civ.A. 1CV–03–0927.**

United States District Court, M.D. Pennsylvania.

April 8, 2004.

ther factual development. *See* n. 20 *supra* and accompanying text.

Jeffrey E. Fogel, Nutley, NJ, Jordan B. Yeager, Boockvar & Yeager, Doylestown, PA, Shayana D. Kadidal, New York City, for Petitioner.

Daryl Ford Bloom, Harrisburg, PA, for Respondents.

### MEMORANDUM AND ORDER

KANE, District Judge.

Petitioner Farouk Abdel–Muhti, a detainee of the Bureau of Immigration and Customs Enforcement ("ICE"), is subject to a final order of removal dated September 25, 1995, to deport him to either Jordan or Israel. (Doc. No. 8, Ex. 1). He filed this habeas corpus petition, brought pursuant to 28 U.S.C. § 2241, in the District Court for the District of New Jersey on November 6, 2002. On June 3, 2003,

after Petitioner was moved to the York County Prison, his case was transferred to this Court. An Amended Verified Petition was filed on September 11, 2003. (Doc. No. 8). A hearing on the petition was conducted on March 30, 2004.[1] Petitioner alleges, *inter alia,* that his continued detention while awaiting removal, now approaching two years, is in violation of § 241(a)(6) of the Immigration and Nationality Act, as interpreted by the Supreme Court in *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). For the reasons explained below, this Court must agree. Accordingly, his release will be ordered under conditions of supervision set forth in 8 U.S.C. § 1231(a)(3) and implementing regulations.

## I. *Background*

Petitioner represents, and ICE has produced no evidence to refute the claim, that he is a Palestinian who was born in 1947 in the West Bank in Ramallah. At the time, the West Bank was part of "Mandate Palestine," ruled by Britain. ·Of course, since that time, the area has been governed by the Hashemite Kingdom of Jordan from 1948 to 1988, and is now classified as a "territory under foreign military occupation." (Doc. No. 8, Ex. C; Aff. No. 6 of Cobban).

The first record of Petitioner's entry into the United States is on November 18, 1963, when, at the age of sixteen, Petitioner entered the United States as a visitor for pleasure under the name of George Muhti Nasser. (Doc. No. 12, Ex. A). On April 21, 1964, approximately five months after his arrival, he was deported to Honduras after overstaying his visa. Less than a year later, on March 31, 1965, he re-entered the United States under the

name of Jorge Alberto Muhti–Nasser and represented to immigration officials that he was a United States citizen born in Puerto Rico. The following month, he informed immigration officials that he was from Honduras. On October 5, 1965, he was convicted of illegal re-entry and, within a month, he "self-deport[ed] to Peru." (Doc. No. 17, Ex. C at 1). During this time, he also gave officials various conflicting dates of birth. (*See, e.g.,* Doc. No. 1, Part 17, Ex. 2, April 3, 1964 Aff. (birth date of June 25, 1944); Ex. 8, record of sworn statement (birth date of June 17, 1944)).

In September 1971, Petitioner illegally re-entered the United States without inspection and was placed in deportation proceedings. On November 5, 1975, he reported to immigration officials for the first time that he was Palestinian. He was immediately granted the discretionary relief of voluntary departure with an alternate order of deportation. (Doc. No. 8, Ex. D). He failed to depart as agreed and therefore, the order became a final order of removal. He was released under an order of supervision, with a bond, pending removal. In July 1982, he failed to report as ordered. (Doc. No. 8, Ex. E at 3 (notation)).

### *Petitioner's April 26, 2002 Detention*

Approximately eleven years later, immigration officials became aware of Petitioner's whereabouts following his May 7, 1993, arrest for 1st degree forcible rape, forcible sexual assault, assault with intent to cause physical injury, menacing in the 2nd degree and criminal possession of a weapon in the 4th degree. On June 29, 1993, he pled guilty to one count of attempted assault.[2] His immigration case

---

**1.** Except for the submission of the Declaration of Lisa Hoechst by the Government, the parties declined the opportunity to present evidence at the hearing and offered argument only.

**2.** As noted in the February 11, 1994 Oral Decision of the Immigration Judge, Petitioner vigorously contested the more serious charges, claiming that his accuser, his wife,

was reopened on the INS's unopposed motion, and Petitioner was released on a $15,000.00 bond pending a hearing. (Doc. No. 8, Ex. E). Petitioner failed to appear for a September 25, 1995 hearing. He had been ordered removed to Palestine in 1975 (Doc. No. 8, Ex. D), and then following the motion to re-open (Doc. No. 8, Ex. E), he was subsequently ordered removed to either Jordan or Israel *in absentia* under the name Faruk Mahmoud Abdel–Muhti. (Doc. No. 8 at 16; Doc. No. 1, Part 17, Ex. 43). Petitioner filed a motion to re-open on October 5, 1995, providing evidence of an emergency stay in the hospital that prevented him from appearing at the hearing. (Doc. No. 8, Ex. G, Aff. of Farouk Abdel–Muhti). The motion was opposed by the Government and eventually denied. (Doc. No. 1, Part 22, Suppl. Ex. 47). However, it was not until April 26, 2002 that Petitioner was taken into custody on the September 25, 1995 removal order. He has been in continuous detention since that date. During the more recent proceedings, Petitioner has given his date of birth as August 9, 1947 (Doc. No. 1, Part 2, verified habeas petition); July 17, 1944 (Doc. No. 10, Ex. G, attach, to motion to re-open); and September 1947 (Doc. No. 1, Part 17, Ex. 39, oral representation to IJ in 1994).

### *November 25, 2002 Custody Review*

While in custody, Petitioner filed a Request for Custody Review with the Headquarters Post-order Detention Unit ("HQPDU"), which was denied in a November 25, 2002, "Decision to Continue Detention." The HQPDU Director/Designated Representative who reviewed Petitioner's request stated as follows:

The Service has requested a travel document from the Embassy of Jordan and the Embassy of Honduras. The Embassy of Jordan has refused to issue a travel document. The Embassy of Honduras has advised the INS that they are still conducting an investigation in Honduras to verify your information. However, it should be noted that you have not provided sufficient evidence to prove you [sic] nationality and identity. In fact, you have given conflicting information during three sworn statements. On March 31, 1965, you stated that you were a U.S. citizen born in Puerto Rico. On April 1, 1965, you stated that you were Honduran. On November 5, 1975, you stated that you were Palestinian born in Israel. Other information available to the INS shows that you may have been born in Cuba.[3] You have also used at least ten different aliases. It would not be proper for the INS to release a person whose identity can not [sic] be verified. You are required to provide sufficient evidence to prove your identity and nationality. You must also attempt to get a travel document on your own behalf. You must contact your Embassy and provide them with enough evidence to secure a travel document.

(Doc. No. 17, Ex. B at 2). Thereafter, Petitioner's counsel continued their efforts to secure travel documents from any country to which Petitioner had a connection. A legal assistant, MacDonald Scott, met with Ahmad Ibrahim, a man who knew Petitioner in Palestine and in New York; had further conversations with the Honduran Consulate; contacted the Palestinian Liberation Organization ("PLO") Mission

suffered from a mental impairment. He pled guilty to a class B misdemeanor and was sentenced to time served, 27 days. (Doc. No 1, Part 17, Ex. 39).

**3.** After careful review of the voluminous record, the Court cannot find any record that Petitioner ever claimed to be Cuban, or any mention of his nationality as Cuban, save this one reference.

in Washington, DC; contacted the Egyptian consulate for possible entry into Palestinian lands through that country; interviewed INS officials regarding a chartered flight to Palestine via Egypt and the statistics of successful Palestinian deportations; and contacted Monica Tarazi, an expert in the area, about the possibility of Israel accepting Palestinian deportees. (Doc. No. 10, Exs. C & D, Aff. & Suppl. Aff. of Scott).

### November 25, 2003 Custody Review

On June 9, 2003, Petitioner filed another Request for Custody Review, citing the lack of success in obtaining travel documents from the Jordanian and Egyptian Governments as well as the refusal of the Palestinian National Authority to issue documents. (Doc. No. 17, Ex. A). A Post Order Custody Review was conducted on November 25, 2003. (Doc. No. 17, Ex. F at 5). Petitioner was not present at the review and the Reviewing Officer did not interview Petitioner at any time prior to making his recommendation to continue detention. However, in filling out the "Post Order Custody Review Worksheet," under the subsection addressing "Travel Documents Status/History," the Reviewing Officer listed the "aliens [sic] attempts to get travel documents and status (to include any actions alien has taken to prevent removal . . .)" as follows:

With respect to attempts to repatriate Petitioner to Jordan, the Reviewing officer documented the following actions:

On May 20, 2002, a travel document request was forwarded to the Consulate General of Jordan. The presentation contained a copy of a birth certificate provided Mr. Abdel–Muhti. On June 14, 2002, the Consulate General of Jordan denied the travel document issuance.

On June 2002, a travel document request was sent the Embassy of Jordan. On October 8, 2002, the Hashemite Kingdom of Jordan refused to issue a travel document stating that identity could not be established.

*Id.* at 5. The Reviewing Officer documented the following attempts that were made to obtain travel documents from Palestine:

On March 6, 2003, Bret Bradford at BICE HQ advises that Headquarters is attempting to procure a travel document from the Palestine Mission in Washington, D.C.

On May 30, 2003, Bret Bradford at BICE HQ advised that travel document still pending.

On September 30, 2003, I contacted BICE Headquarters inquiring about the status of a travel document from the Palestine Mission in Washington, D.C. Bret Bradford advised that Abdel–Muhti's history of providing fraudulent information concerning his nationality is hindering BICE efforts in obtaining a travel document.

*Id.* The Officer also cited the following with respect to attempts made to return Petitioner to Honduras:

On September 6, 2002, a travel document request was forwarded to the Consulate General of Honduras. The presentation contained a copy of a birth certificate and number of Honduran Passport.

On October 11, 2002, Ms. Maximo at the Consulate General of Honduras advised Officer Peralta that subject's birth certificate and nationality must be verified in Honduras.

On January 2003, the consular authorities in the Consulate General of Honduras advised that they are awaiting verification from Honduras regarding Citizenship.

On July 21, 2003, Ms. Maximo advised Officer Gill that she had not heard anything from her counterparts in Hondu-

ras and the travel document request is still pending.

On August 4, 2003, I forwarded a travel document request to the Embassy of Honduras.

On November 24, 2003, Tammy Cyr at BICE Headquarters advised that she contacted the Honduran Embassy regarding the Naturalization records to see if Abdel–Muhti naturalized in Honduras. She requested specific information regarding the birth certificate that he provided to ascertain its validity.

*Id.* The Reviewing Officer further found that "[o]n January 16, 2003, in an effort to secure information that could assist in the procurement of a travel document, Form I–229 is served on Mr. Abdel–Muhti. He is advised [sic] his responsibilities in the travel document process. Advised that he must assist and provide necessary data and reveal his true and valid identity. Subject refused to sign and acknowledge receipt of form." *Id.* The Reviewing Officer concluded that "Mr. Abdel–Muhti has not established his compliance with the obligation to effect his removal and to cooperate in the process of obtaining necessary travel documents. It is the recommendation of this officer that he remain in the custody of BICE pending his genuine cooperation and subsequent issuance of travel documents." *Id.* at 7. On the same date that the review was conducted, November 25, 2003, the "Deciding Official's Custody Determination" was to continue Mr. Abdel–Muhti's detention. *Id.*

*February 3, 2004 Notice of Failure to Comply*

Until this Court issued an Order on January 21, 2004 directing the Government to supplement the record and explain the rationale behind the continued detention of Petitioner, no further proceedings were conducted before the ICE. (*See* Doc. No. 16). Then, on February 3, 2004, the ICE issued a Notice of Failure to Comply

pursuant to 8 C.F.R. § 241.4(g) for Petitioner's alleged refusal to cooperate and acting to prevent removal. (Doc. No. 17, Ex. G). It was concluded therein that:

An investigation of your identity by the Government of Honduras revealed that your purported birth certificate is fraudulent. To date, you have provided no additional evidence of your identity, nor have you demonstrated any good faith efforts to obtain the required documentation.... As you have failed to make efforts to provide or obtain the required evidence of identity, you have failed to comply with your obligation and are acting to prevent your removal from the United States.

(Doc. No. 17, Ex. G). Petitioner was then informed that: "You are to remain in ICE custody until you demonstrate that you are making reasonable efforts to comply with the order of removal, and that you are cooperating with ICE's efforts to remove you." *Id.*

## II. *Discussion*

■ This case is before the Court on a Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2241. Petitioner seeks immediate release from ICE custody, arguing that his continued detention violates the laws and Constitution of the United States. 28 U.S.C. § 2241(c)(3). This Court has jurisdiction over this matter pursuant to § 2241 and consistent with *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).

The detention, release, and removal of aliens subject to a final order of removal is governed by § 241 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231. Pursuant to INA § 241(a), the Attorney General has ninety days to remove an alien from the United States after an order of removal becomes final. During this "removal period," detention of the alien is mandatory. *Id.* After the ninety-day period, if the alien has not been removed and

remains in the United States, his detention may be continued, or he may be released under the supervision of the Attorney General. INA § 241, 8 U.S.C. §§ 1231(a)(3) and (6). Under this section, ICE may detain an alien for a "reasonable time" necessary to effectuate the alien's deportation. INA § 241(a), 8 U.S.C. § 1231(a). However, indefinite detention is not authorized. *Id.* The statute also allows officials to extend the 90 day removal period "if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal." INA § 241(a)(1)(C); 8 U.S.C. § 1231(a)(1)(C).

 In *Zadvydas,* the Supreme Court defined six months as a presumptively reasonable period of detention. 533 U.S. at 701, 121 S.Ct. 2491. After this six-month period, an alien must be released if he provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future. If he does make this showing, ICE must rebut it to keep him in custody. *Id.* "For detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id.*[4] Therefore, the Court must "ask whether the detention in question exceeds a period reasonably necessary to secure removal. It should measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal. Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." *Zadvydas,* 533 U.S. at 699, 121 S.Ct. 2491.

### *Foreseeability of Removal*

There can be little doubt that Petitioner has satisfied the *Zadvydas* burden of demonstrating that he is not likely to be removed in the reasonably foreseeable future. During the course of his forty year history with immigration authorities, Petitioner has produced evidence of nationality only to Honduras and Jordan. ICE records establish that Honduras has rejected Petitioner's claim of Honduras as his birth country and declined to accept him. (Doc. No. 17, Ex. G).[5] Likewise, Jordan has

4. Following *Zadvydas,* immigration regulations were amended to provide guidelines for the ICE to use in determining whether removal is reasonably foreseeable:

The HQPDU shall consider all the facts of the case including, but not limited to, the history of the alien's efforts to comply with the order of removal, the history of the Service's efforts to remove aliens to the country in question or to third countries, including the ongoing nature of the Service's efforts to remove this alien and the alien's assistance with those efforts, the reasonably foreseeable results of those efforts, the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question, and the receiving country's willingness to accept the alien into its territory. Where the Service is continuing its efforts to remove the alien, there is no presumptive period of

time within which the alien's removal must be accomplished, but the prospects for the timeliness of removal must be reasonable under the circumstances.

8 C.F.R. § 241.13(f). There is no evidence in the present case that the Government applied these standards. Rather, the ICE summarily concluded that removal was foreseeable if Petitioner fully cooperated. However, as discussed below, there are serious questions as to whether an individual such as Mr. Abdel–Muhti can be deported to Palestine at all, independent of the issue of whether he fully cooperated in securing travel documents.

5. The Government attributes Honduras' rejection of Petitioner to Petitioner's failure to provide adequate information. Although representatives of Honduras cited insufficient evidence as the basis for Petitioner's rejection, it

refused him admittance on the basis of his Jordanian birth certificate, finding that his "identity could not be established." (Doc. No. 17, Ex. F at 5).

As noted in detail below, the Court credits Petitioner's claim that he is Palestinian, born in Ramallah in the West Bank in 1947. As a Palestinian, he is a man without a country, or a "stateless person." (*See* Doc. No. 10, Ex. B, Takkenberg, Lex, The Status of Palestinian Refugees in International Law (1998) at 178–81). Following the chronology of countries historically in control of the West Bank since 1947, efforts have been made by the ICE and by Petitioner's counsel to obtain travel documents to each of those countries. These efforts have failed. Although possessed of a Jordanian birth certificate because Jordan exercised ministerial functions during the time the certificate was issued, Petitioner has no ties to Jordan that would support any expectation of removal to that country. (Doc. No. 8, Aff. No. 6). Not surprisingly, Jordan has rejected Petitioner, claiming it is unable to verify identity. (Doc. No. 17, Ex. F at 5). Israel rejected Petitioner in 1976. (Doc. No. 8, Ex. D). Petitioner was not found in that country's registry of occupants of the West Bank. *Id.* In October of 2003, the PLO Mission rejected Petitioner's request for assistance, noting that a registration number with Israel was required and expressing the belief that Jordan had jurisdiction over this matter. (Doc. No. 10, Ex. A; Doc. No. 10, Ex. D & Attach.). The lengthy history of Petitioner's efforts, made while in custody, and of those of the ICE to repatriate him to the West Bank, support his claim that he cannot be deported in the reasonably foreseeable future.

Petitioner has been in custody since April 2002, and has been held approximately fifteen months past his presumptively reasonable period of detention without being successfully removed. As stated above, for the detention of Petitioner to remain reasonable, as the period of post-removal confinement grows, what qualifies as the "reasonably foreseeable future" conversely would have to shrink. *Zadvydas,* 533 U.S. at 703, 121 S.Ct. 2491. Based on the record, the Court concludes that Petitioner has met his burden under *Zadvydas* to show that there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701, 121 S.Ct. 2491.

### Government's Response

■ Once Petitioner establishes that removal is not likely in the reasonably foreseeable future, the burden shifts to the Government to rebut this showing. *Zadvydas,* 533 U.S. at 701, 121 S.Ct. 2491. The Government seeks to rebut this showing by demonstrating first that removal is likely very soon and second that if removal is not likely in the "reasonably foreseeable future," the delay is Petitioner's own doing, and thus, the proscriptions of *Zadvydas* have no application. Both claims by the Government are unavailing.

Apparently in an effort to refute Petitioner's claim that he cannot be removed to Palestine, the Government supplemented the record, producing less than one hour before the hearing on Petitioner's habeas petition, an affidavit stating the following:

4. In early March 2004, DRO [Detention and Removal Operations] officials

---

is noteworthy that following Honduras' rejection of Petitioner's request for travel documents for lack of information, there is no record that the ICE sought additional information from Petitioner or inquired of Honduras as to what additional information that country required. Moreover, ICE informed Honduras that "subject has a criminal record which includes rape/sex abuse and assault." (Doc. No. 1, Part 17, Ex. 36 at 2). As discussed below, Petitioner was never convicted of these crimes.

met with representatives of the Government of Israel to discuss Palestinian repatriations. As a result of this meeting, new procedures regarding repatriation were agreed upon.

5. Under the new procedures, a Palestinian national's biographic information will be submitted to the Israeli Consulate. Once the Government of Israel verifies that the individual is listed in the population registry for the Palestinian territories, the government of Israel will grant permission for the Palestinian national to transit the country to enter either the West Bank or the Gaza Strip.

6. This new procedure alters the previously problematic process in which Palestinians could not be removed in the absence of an original Israeli or Palestinian travel document.

7. Mr. Abdel–Muhti's information will be submitted to the Israeli government in the very near future. It is anticipated that the implementation of this new process will bring about the likelihood of ICE removing Mr. Abdel–Muhti in the reasonably foreseeable future.

(Doc. No. 22, Declaration of Lisa Hoechst, Acting Chief for Removals Support and Coordination).

Thus, the Government maintains that diplomatic progress will permit the removal of some Palestinians to the West Bank. At argument, the Government conceded that it is not known whether removal will be available under the agreement in one month or in one year. Moreover, even were the Government granted the opportunity to arrive at a more specific estimate of the length of time for Petitioner's re-moval under this agreement generally, the record does not support the Government's suggestion that Petitioner will be a beneficiary of this agreement, when Petitioner's claim to deportation to the West Bank was rejected by Israel in 1976. (Doc No. 8, Ex. D). If Petitioner has any hope of being removed to the West Bank under the March 2004 agreement, it is clear that his removal will not be routine, and that it is not imminent. While confinement of weeks, months, or even years pending removal under the March 2004 agreement may pass Constitutional muster in some cases, it cannot under the circumstances of this case. A possibility of removal at some future inestimatable time for someone who has been in custody for almost two years will not suffice under *Zadvydas.*

The records establishes that ICE failed to deport Petitioner to Israel in 1976 for want of an identification number. (Doc. No. 1, Part 17, Ex. 26). There is no evidence in the record or representation to the Court that a number is available for Petitioner now, or that he is listed in the population registry. Perhaps these obstacles will not prove to be insurmountable, and Petitioner's removal will ultimately be effected. Based on the record before the Court, however, the Government has not rebutted the presumption that removal is not likely to occur in the reasonably foreseeable future.

### Failure to Cooperate as Basis for Continued Detention

 There are no pending criminal charges against Petitioner, nor has the Government argued at any point that Petitioner's continued detention is based on danger to the community.[6] Rather, the

---

6. The manner in which Petitioner's criminal history has been summarized throughout proceedings before ICE and this Court hints that he is a dangerous individual, and threatens to divert attention from the real matters at issue. The Government brands him in these proceedings as a "convicted criminal several times over," (Doc. No. 1, Part 15, Answer to petition at 1), and references jail records that report anti-American statements and Petitioner's attempt to make Muslim converts during his incarceration. (Doc. No. 17, Ex. F at 3). However interesting this information may be

Government argues that Petitioner's continued detention is justified because he "has knowingly and actively hindered his removal from the United States." (Doc. No. 17 at 3). It is well established that *Zadvydas* does not apply where a detainee who holds the keys to his freedom thwarts his removal by lying or refusing to cooperate with ICE. INA § 241(a)(1)(C), 8 U.S.C. § 1231(a)(1)(C); *Kovalev v. Ashcroft,* 71 Fed.Appx. 919, 924, 2003 WL 21758396 (3d Cir.2003) (non-precedential decision); *Pelich v. I.N.S.,* 329 F.3d 1057, 1061 (9th Cir.2003). This principle is implemented by regulation found at 8 C.F.R. § 241.4(g).[7]

Several district courts and one Circuit Court have considered failure to cooperate as an exception to *Zadvydas* pursuant to INA § 241(a)(1)(C). 8 U.S.C. § 1231(a)(1)(C). The Ninth Circuit held that an "alien cannot assert a viable constitutional claim when his indefinite detention is due to his failure to cooperate with the INS's efforts to remove him." *Pelich v. I.N.S.,* 329 F.3d 1057, 1061 (9th Cir.2003). In that case, the Court determined that the continued detention of the alien was due to his own conduct: "[Petitioner] could likely effectuate his own removal (and free himself from detention) by providing the Polish government with the requested information. It naturally follows that his detention is not destined to be indefinite." *Id.* Thus, the Ninth Circuit has interpreted INA § 241(a)(1)(C) after *Zadvydas* to permit continued detention of a removable alien "so long as the alien fails to cooperate fully and honestly with officials to ob-

to law enforcement officials, where the Government is not opposing Petitioner's release on grounds of dangerousness, it can only serve to cloud the issues before the Court and place Petitioner in a bad light. As noted at Footnote 2, Petitioner has never been convicted of a sex crime. He first came to the attention of police in 1964, and again in 1965, for selling rugs and then neckties, without a license. His next police encounter occurred in 1972, when he was observed writing on a subway poster. The police encounter escalated, and Petitioner was charged with resisting arrest and other crimes, but ultimately convicted only of harassment. (Doc. No. 8, Ex. F). Petitioner was convicted of misdemeanor harassment in 1993 after his wife's complaint of felony sex-related offenses. The suggestion that Petitioner is a danger to the community is opposed by the numerous letters of support and affidavits submitted in support of Petitioner's petition for writ of habeas corpus. (Doc. No. 8, Ex. I). These individuals characterize Petitioner as a peaceful, meek man who confronts racism and anti-Semitism (*See, e.g., Doc. No. 1, Part 10, Jane Guskin Aff. No. 5*), a dedicated father (*See, e.g. Doc. No. 8, Ex. I, Joseph Kaye letter*), and an asset to the community (*See, e.g. id., James Mendieta Aff.*). The Court need not resolve this disagreement, as the Government's basis for detention is lack of cooperation, not dangerousness.

7. The regulation provides:

(i) Release will be denied and the alien may remain in detention if the alien fails or refuses to make timely application in good faith for travel documents necessary to the alien's departure or conspires or acts to prevent the alien's removal. The detention provisions of section 241(a)(2) of the Act will continue to apply, including provisions that mandate detention of certain criminal and terrorist aliens.

(ii) The Service shall serve the alien with a Notice of Failure to Comply, which shall advise the alien of the following: the provisions of sections 241(a)(1)(C) (extension of removal period) and 243(a) of the Act (criminal penalties related to removal); the circumstances demonstrating his or her failure to comply with the requirements of section 241(a)(1)(C) of the Act; and an explanation of the necessary steps that the alien must take in order to comply with the statutory requirements.

(iii) The Service shall advise the alien that the Notice of Failure to Comply shall have the effect of extending the removal period as provided by law, if the removal period has not yet expired, and that the Service is not obligated to complete its scheduled custody reviews under this section until the alien has demonstrated compliance with the statutory obligations.

8 C.F.R § 241.4(g)(5)(i)-(iii).

tain travel documents." *Lema v. INS,* 341 F.3d 853, 857 (9th Cir.2003).

Similarly, district courts to consider this issue ask whether the petitioner has the "keys to his freedom," *Pelich,* 329 F.3d at 1060, to determine whether he is preventing his own removal pursuant to INA § 241(a)(1)(C). *See, e.g., Clark v. Ashcroft,* No. 03–3320, 2003 WL 22351953 at *3–4 (E.D.Pa. Sept. 16, 2003) (alien initially misrepresented his country of origin, but later gave his true name and identity; the government showed no evidence of non-cooperation since that time); *Rajigah v. Conway,* 268 F.Supp.2d 159, 165–66 (E.D.N.Y. 2003) (finding no bad faith failure to cooperate where alien made truthful statements to Guyanese ambassador regarding his intent to file another court action, which the government considered failure to comply); *Seretse–Khama v. Ashcroft,* 215 F.Supp.2d 37, 51–53 (D.D.C.2002) (alien's truthful statements to Liberian officials that he did not wish to return to Liberia did not amount to bad faith failure to cooperate since it was not the reason for failure to issue travel documents; rather, it was their concern for his lack of ties to that country); *Powell v. Ashcroft,* 194 F.Supp.2d 209, 210 (E.D.N.Y.2002) (repeated inconsistencies regarding alien's identity "demonstrably hampered the INS in carrying out his removal"). Thus, this Court must carefully examine the record to determine Petitioner's part in his continued detention.

It is undisputed that Petitioner has provided false and inconsistent information regarding his nationality and birth date. In 1964, Petitioner claimed to be Honduran and in 1965 he told authorities that he was Puerto Rican. His falsehoods may have frustrated and delayed ICE's efforts to remove him. At best, however, his early misrepresentations caused the ICE to expend needless time and effort attempting to deport Petitioner to Honduras in 1993. (Doc. No. 1, Part 17, Ex. 36). It is not at all clear why the ICE again attempted deportation to Honduras in 2002, when Honduras had rejected Petitioner in 1993 and ICE itself had determined that Petitioner is from Palestine. *Id.,* Ex. 37. Since 1975, Petitioner has maintained that he is a Palestinian, born in Ramallah. (*Id.,* Ex. 20; *see also* Doc. No. 8, Ex. D, 1975 Dec. of IJ). While his previous falsehoods require that this representation be viewed carefully, Petitioner has offered support for this contention beyond the bald allegation that he is Palestinian born. In December, 2002, he provided an Affidavit of Ahmad Ibrahim, who swears that he knew Mr. Abdel–Muhti's family in Ramallah, recalls the announcement of Mr. Abdel–Muhti's birth, remembers Abdel–Muhti as a youth, and knows Petitioner from a Palestinian gathering in Brooklyn, New York. (Decl. of Ahmad Ibrahim, Doc. No. 10, Ex. D, Ex. 1).[8] Petitioner has also provided ICE with his Jordanian birth certificate (Doc. No. 1, Part 17, Ex. 44, original and translated birth certificates from Petitioner's immigration file), and has provided a plausible explanation why this document alone is insufficient for Jordan to issue travel documents. (Doc. No. 10, Ex. D, Ex. 8, Aff. of Monica Tarazi; Doc. No. 1, Pts. 11–12, Aff. of Cobban). Petitioner has submitted scores of affidavits and letters of support from persons of all walks of life, including teachers, a college professor, activists, government workers, and students. Many of these speak to Petitioner's obvious Palestinian heritage and his devotion to the plight of Palestinians. These witnesses attest that Petitioner demonstrates knowl-

---

8. Mr. Ibrahim testified to these matters in February, 1994. The INS examiner credited his testimony along with that of Petitioner's son, Tarasir, then 16 years old. (Doc. No. 1, Part 17, Ex. 39, Oral Order of IJ).

edge of the culture and language of the Middle East, (Doc. No. 8, Ex. I, "Letters of Support," Martin Hoffert letter), that he serves as a principled spokesman for Palestinians in the New York area, (*Id.*, Bill Neinberg letter), that he educates others regarding Palestinian heritage (*Id.*, Ronald J. Saleh letter), and that he is an "important asset to· the New York community," (*Id.*, Laura Castro letter). Many attest to Petitioner's membership and involvement in Palestinian human rights groups, including Palestinian Aid Society of New York, noting that he is a devoted educator and humanitarian (Doc. No. 8, Ex I, Bernard M. McFall Aff.), and a spokesman against racism and discrimination in general, and the plight of the Palestinians specifically (Jane Guskin Aff., Doc. No. 1, Part 2, Aff. No. 5).

Petitioner, through his counsel, has sought travel documents from Jordan, Israel, Palestinian Authorities, Honduras, and Egypt. (*See* Doc. No. 10, Exs. C & D, Aff. and Suppl. Aff. of MacDonald Scott). All efforts have been unsuccessful due to his unique position as a Palestinian-born individual who is ineligible for either Israeli or Palestinian identification numbers. Government efforts have likewise been fruitless, and show no indication that Petitioner's actions are at all responsible for the failure. (Doc. No. 17, Ex. F at 5).

In support of its request for continued detention based on lack of cooperation, the government maintains that Petitioner has lied and withheld information on many occasions. The record does reveal that before 1975, Petitioner lied about his country of origin, and that he gave a false date of birth many times. (*See, e.g.*, Doc. No. 1, Part 22, Suppl. Ex. 47 at 7, n. 1). Since his current detention commenced, however, there is no evidence that he has withheld information or that his claim of Palestinian origin is false. The record discloses that the ICE requested information of Pe-

titioner on three occasions. First, in connection to Petitioner's November 25, 2002 custody review, Petitioner was directed as follows: "You are required to provide sufficient evidence to prove your identity and nationality. You must also attempt to get a travel document . on your own behalf. You must contact your Embassy and provide them with enough evidence to secure a travel document." (Doc. No. 17, Ex. B). Petitioner responded by contacting embassies and consulates in Honduras, Jordan, Israel, Egypt and the PLO Mission in efforts to obtain a passage to Palestine or to Honduras, where he had resided in the early 1960s. (Doc. No. 10, Exs. C & D, and attach.). These attempts to satisfy the ICE directive are documented in the order following the November 25, 2003 custody review. (Doc. No. 17, Ex. F at 5). In spite of Petitioner's documented efforts to assist in his removal, ICE served him with Form I–229 on January 16, 2003, directing that he assist in his removal by providing information and revealing his true and valid identity. Petitioner refused to sign the Form. *Id.* On February 3, 2004, Petitioner was directed to "demonstrate that you are making reasonable efforts to comply with the order of removal, and that you are cooperating with the ICE's efforts to remove you." (Doc. No. 17, Ex. G).

It is this February 3, 2004 notice of failure to comply, issued pursuant to 8 C.F.R. § 241.4, upon which the Government relies in charging a failure to cooperate. The Notice, issued after nearly two years of detention, two reviews of Petitioner's custody, and, finally, resort to the Courts, does not comport with ICE's regulatory requirements. *See* 8 C.F.R § 241.4(g)(5)(ii)-(iii). The notice informs Mr. Abdel–Muhti that he had been advised, on November 25, 2002, and January 16, 2003, that he was required to provide evidence of his identity and nationality and make efforts to obtain travel documents.

(Doc. No. 17, Ex. G). It further provides that Petitioner's Honduran birth certificate was investigated by the Honduran Government and found to be fraudulent and that,

> To date, you have provided no additional evidence of your identity, nor have you demonstrated any good faith efforts to obtain the required documentation.... As you have failed make [sic] efforts to provide or obtain the required evidence of identity, you have failed to comply with your obligation [under the INA] and are acting to prevent your removal from the United States.

*Id.* Far from detailing the "circumstances demonstrating his or her failure to comply with the requirements of section 241(a)(1)(C) of the Act; and an explanation of the necessary steps that the alien must take in order to comply with the statutory requirements," as required by 8 C.F.R. § 241.4(g)(5)(ii), the Notice simply states: "You are to remain in ICE custody until you demonstrate that you are making reasonable efforts to comply with the order of removal, and that you are cooperating with ICE's efforts to remove you." (Doc. No. 17, Ex. G). Finally, the Notice advises Mr. Abdel–Muhti of the criminal penalties available to ICE in INA § 243(a), 8 U.S.C. § 1253(a) for his alleged refusal to apply for travel documents and prevent his removal. *Id.* The Notice does not make any of the notifications required under 8 C.F.R. § 241.4(g)(5)(iii) related to extending the removal period and future custody reviews.[9]

No court has addressed the quantum of evidence necessary to establish lack of co-operation sufficient to justify an otherwise unconstitutional detention. Surely, just as what qualifies as "reasonably foreseeable future" must shrink under *Zadvydas* as the length of confinement grows, so must the amount of evidence supporting a finding of non-cooperation expand with the length of detention. As noted above, under any standard, this record does not support a finding that Petitioner has failed to comply with any specific directive of ICE. While ICE requested information or action of Petitioner to assist ICE in removal, this was done in little more than a blanket accusation of hindrance and a demand to produce identifying documentation. ICE fails to establish that Petitioner has refused to comply with its requests, and thus is himself responsible for his continued detention as a matter of fact and law.

### Conclusion

It has been nearly two years since Mr. Abdel–Muhti was taken into immigration custody. All efforts by ICE, as well as any efforts by counsel for Petitioner, to obtain travel documents have been unsuccessful. Based on *Zadvydas*, Abdel–Muhti's continued detention is no longer presumptively reasonable. Petitioner has shown, and the government has failed to rebut, substantial evidence that removal is unlikely in the reasonably foreseeable future. Furthermore, the government has not demonstrated that Petitioner's alleged failure to cooperate is hindering their efforts to remove him. It is clear from the record that Petitioner has made a good

---

**9.** The record establishes that Petitioner provided ICE with his birth certificate, including his parents' names, and his region of origin, and made substantial efforts to obtain travel documents. Yet in a Kafkaesque exchange that began with Petitioner's November 25, 2002 custody review and culminated with a post-hearing request that he complete a form that was completed and submitted to Israel on November 20, 1975, ICE persists in its demand that he produce something more. While ICE is empowered to prosecute and detain those who withhold information, absent some reasonable basis for its apparent suspicion that Petitioner is lying or withholding information, the law does not authorize ICE to continue Petitioner's detention until he supplies answers it likes.

faith effort to obtain travel documents and comply with ICE's requests. The notice of failure to comply is insufficient to continue to detain Mr. Abdel–Muhti. Accordingly, Petitioner is entitled to the habeas relief he seeks. This Court will release Petitioner from custody, subject to reasonable terms and conditions as ICE deems necessary to assure Petitioner's appearance and return, pending the issuance of travel documents to effect his removal.

### III. *ORDER*

**AND NOW**, therefore, this *8th* day of April, 2004, **IT IS ORDERED THAT:**

1. The Amended Verified Petition for Writ of Habeas Corpus (Doc. No. 8), filed pursuant to 28 U.S.C. § 2241, is **GRANTED**;

2. The ICE shall **RELEASE** Petitioner Farouk Abdel–Muhti **FORTH-WITH** under reasonable conditions of supervised release as determined by ICE in accordance with the provisions of 8 U.S.C. § 1231(a)(3) and 8 C.F.R. § 241.5;

3. Within ten (10) days of the date of this Order, ICE shall report to this Court the fact of Petitioner's release and any conditions imposed on Petitioner's release;

4. The Clerk of Court shall **CLOSE** this case.