

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-9-2004

# Yassir v. Ashcroft

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-4575

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Yassir v. Ashcroft" (2004). *2004 Decisions.* Paper 405.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/405

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-4575

———

SALIM YASSIR,

Appellant

v.

JOHN ASHCROFT, Attorney General
of the United States of America

———

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
D.C. Civil No. 02-cv-06115
District Judge:  The Honorable William J. Martini

———

Argued: July 15, 2004

———

Before: SLOVITER, BARRY, and WEIS, <u>Circuit Judges</u>

———

(Opinion Filed: August 9, 2004)

———

Joshua Bardavid, Esq. (Argued)
Law Office of Theodore N. Cox
401 Broadway, Suite 701
New York, NY  10012

<u>Attorney for Appellant</u>

Yanet P. Noble, Esq. (Argued)
Thomas R. Calcagni, Esq.
Office of the United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

Attorneys for Appellee

———

OPINION

———

BARRY, Circuit Judge

By his own account, Salim Yassir was born in Gaza City in Palestine on January 1, 1976. At the age of ten, Yassir–accompanied by his uncle–relocated to a refugee camp in Libya. After his father and sister died in Gaza in the late 1980s, Yassir was joined in Libya by his mother in 1990. Yassir remained in Libya until 1999, when, with the help of his uncle, he made his way to Syria via Egypt. In Syria, he obtained a false passport which enabled him to travel to England. From England, Yassir stowed away on a ship bound for the United States, seeking, in his own words, "the land of opportunity" and "democracy and justice and freedom." A46.

On August 29, 2000, the ship on which Yassir was stowed arrived at Port Elizabeth, New Jersey. On attempting to enter the United States, Yassir was detained and

has remained detained at the Elizabeth, New Jersey Detention Center ever since.[1] He sought asylum, but asylum was denied and an order of removal subsequently issued. However, neither the government nor Yassir has been able to locate a country willing to accept him and issue travel documents for him. He is, quite literally, a man without a country.

The government has repeatedly and consistently taken the position over the almost four years that Yassir has been detained that his continued detention is necessary solely because of uncertainties about his identity.[2] No other reason has been proffered. Thus, after a custody review on February 26, 2002, the government stated that it was necessary that Yassir's detention continue because no travel documents had been obtained for him from the Palestinian Liberation Organization (PLO). A17. On August 5, 2002, in an interview conducted as a follow-up to the February 26 custody review, the government noted that the PLO had not yet confirmed Yassir's identity. A22-25. On January 31,

---

[1]Yassir was originally detained by the Immigration and Naturalization Service (INS). INS responsibilities, however, were transferred to the Department of Homeland Security (DHS) by the Homeland Security Act of 2002. Pub. L. 107-296; 116 Stat. 2135; 6 U.S.C. § 202(3). Within DHS, detention and removal functions are handled by the Bureau of Immigration and Customs Enforcement (ICE).

[2]Yassir has from day one in this matter identified himself as a person who, though born in Gaza, moved to a Palestinian refugee camp located in Libya, where he lived from the age of ten until his voyage to the United States. He, however, possessed no identifying documents nor was he able to provide any contacts or sources that could verify his identity. Because a stowaway on the same ship as Yassir turned out to be Moroccan, the government initially seemed to have believed that Yassir, too, was Moroccan. As will be explained, however, Yassir's identity is no longer in dispute.

3

2003, after its second custody review, further detention was ordered, the government concluding that Yassir posed a flight risk because his identity and citizenship remained unverified. A15. On February 24, 2004, the government conducted a third custody review and determined as follows: "At this time, ICE cannot be sure of whom [sic] you are. As such, you are deemed a flight risk and . . . ICE will continue your detention." A13.

Yassir contested the validity of his continued detention by filing a petition for a writ of habeas corpus in the U.S. District Court for the District of New Jersey. Among other arguments, he argued to the District Court–as he does to this Court–that his indefinite detention violates the Due Process Clause of the Constitution.[3] The government, in turn, argued–and argues to us–that it is not a violation of the Constitution to indefinitely detain a non-criminal, inadmissible alien whose identity cannot be verified. The District Court denied Yassir's petition, concluding that "[u]ntil and unless petitioner's identity is confirmed, it is reasonable for the INS to continue his detention[.]" A10.

At oral argument before us, the government conceded that Yassir's identity is no longer in doubt. This concession was based on a letter dated February 13, 2004–approximately three months after the District Court considered this matter–from the PLO Mission in Washington, DC which confirmed that "Mr. Yassir who was born in

---

[3]We have jurisdiction to consider this appeal under 28 U.S.C. § 2253.

4

Gaza in 1976, was ten years old when he left Gaza[,]" and thereby corroborated what Yassir has been telling the Government since he first arrived here nearly four years ago.[4] A27. The government does not dispute the authenticity, veracity or effect of this document.[5] It is clear, then, that the sole stated basis for Yassir's continued detention no longer exists.

This matter, however, is not resolved simply by confirming Yassir's identity. In order to deport Yassir, the United States must find a country willing to issue travel documents for him. As the PLO explains in its February 13, 2004 letter, under the Oslo Accord between the Palestinians and Israelis, no travel documents can be issued for any person who does not have official Israeli or Palestinian identification. A27. Because Yassir left Gaza at age ten–an age at which it seems highly unlikely that he could have had official Israeli or Palestinian documents–under the Oslo Accord neither the PLO nor Israel can now issue travel documents for him.[6]

---

[4]This crucial letter predates by eleven days the most recent (February 24, 2004) custody review conducted by ICE. We must assume, however, that the letter was not before ICE during that review given ICE's conclusion in the review that Yassir's identity had not yet been verified.

[5]In response to a question from the Court as to whether the letter established Yassir's identity, the Assistant U.S. Attorney responded, "I will concede that that's what [the letter] says." Video Transcript at 24:30, Oral Argument, July 15, 2004. This concession is in stark contrast to her surprising representation to us in the government's Motion to Strike this and other documents from appellant's appendix that the PLO letter "does not contain any new facts or information . . . ." Appellee's Letter of 6/1/04 at 2.

[6]New procedures regarding Palestinian repatriation were apparently agreed upon in early March 2004 between officials of the United States government and the government

With the PLO and Israel ruled out as potential authorities that might accept Yassir, at least as of the date of the District Court's opinion, Libya seems the next likely option. From the age of ten until he was twenty-four, Yassir lived in Libya, albeit not as a citizen, but as a refugee. Attempts to obtain travel documents for Yassir from Libya, however, have also been rebuffed. In response to one inquiry, Libya apparently stated that "they would not and will not accept the deportation of Yassir[.]" A122. This was predictable given that, in 1995, Libya, at least officially, expelled all Palestinian refugees.[7] Numerous attempts by the government and by Yassir to obtain travel documents from Morocco and other countries have also failed. Yassir has also, to no avail, asked the United Nations to assist in obtaining travel documents.

Yassir does not contest the government's right to deport him. Rather, he seeks to be released under supervision while the search for a country willing to issue travel documents continues. If and when travel documents are obtained, Yassir asserts that he will voluntarily depart. The government, however, is concerned that Yassir, if not kept in detention, might not surrender himself to authorities voluntarily. We note, however, that,

---

of Israel. Travel documents could potentially issue under this process. *See Abdel-Muhti v. Ashcroft*, 314 F. Supp.2d 418, 425-26 (M.D. Pa. 2004)(citing the Declaration of Lisa Hoechst, Acting Chief of Removals Support and Coordination).

[7]It is possible, at least as a hypothetical matter, that a renewed effort to obtain travel documents from Libya would now meet with success; with the opening of a U.S. liaison office in Tripoli on June 28, 2004, the United States resumed direct diplomatic relations with Libya after a 24 year hiatus. *See, e.g.,* Peter Slevin, *U.S. Resumes Ties With Libya: Relations Renewed After 24 Years*, Wash. Post, June 29, 2004, at A15.

until now, the government has maintained that Yassir posed too great a flight risk to release from detention only because his identity was in doubt, which it no longer is.

Moreover, the fact that Yassir has been detained for nearly four years has garnered the attention of various individuals and institutions, at least one of which will serve as his sponsor, should he be released–Christ House, a residence in the Bronx for victims of torture and for those seeking political asylum.[8] Thus, Yassir comes before us with his identity established, a number of contacts in the community, and a proposed residence and address in the area. And, as discussed above, it surely does not appear reasonably foreseeable that removal is likely, at least any time soon. None of these facts was available for consideration by the District Court.

Yassir's circumstances, then, have changed dramatically since he was first detained and since the District Court had before it his habeas petition. It is not, however, for us as a reviewing court to consider in the first instance these changed circumstances and grant the relief he seeks. Rather, it is for the District Court to weigh the various factors that favor releasing Yassir under supervision against any arguments the government may now make that would, in its view, justify his continued detention.

This matter will be remanded to the District Court for a determination as to

---

[8]We note that Yassir first proposed a potential sponsor to the government in June of 2002. The government alleged, however, without offering any proof, that the sponsor had a criminal record and was, therefore, inadequate. The District Court premised its decision on the uncertainty of Yassir's identity, not on the inadequacy of that sponsor.

whether Yassir should be released under supervision while both he and the government continue to seek a country that will accept him. This remand will be without prejudice to Yassir's right to appeal if the District Court were to determine that release is inappropriate.[9]

---

[9]The primary issue before us, were we required to reach it, concerns the constitutional limits of the indefinite detention of an inadmissible alien. This is a difficult issue and, the government's argument to the contrary, one not decided by us in *Sierra v. Romaine*, 347 F.3d 559 (3d Cir. 2003). We note that *certiorari* has recently been granted in *Benitez v. Wallis*, 124 S.Ct. 1143 (2004), a case presenting the same issue.